***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before former Deputy Commissioner Garner and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, except for certain modifications regarding plaintiff's entitlement to ongoing compensation.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in a Pre-Hearing Agreement as:
 STIPULATIONS
1. Stipulated Exhibit G-1 is the Opinion and Award filed August 20, 1999, by Deputy Commissioner Amy L. Pfeiffer.
2. Pursuant to the Opinion and Award of Deputy Commissioner Pfeiffer, plaintiff continues to receive temporary total disability benefits at the weekly rate of $243.35.
3. Defendant's Exhibit G-1, Industrial Commission Form 24, is admitted into evidence as an application filed by defendant with the Industrial Commission on March 22, 2000, seeking permission to terminate plaintiff's weekly temporary total disability benefits. Pages 26 through 28, page 30, pages 45 and 46, and pages 48 through 159 of Defendant's Exhibit G-1 are also admitted into evidence as records maintained in the regular course of business of Kemper National Services or the preparer of the record identified therein. *Page 3 
4. Defendant's Exhibit G-2 is admitted into evidence as a report filed by defendant with the Industrial Commission on or about April 6, 2000, to supplement the March 22, 2000, Form 24 Application and is also admitted into evidence as a record maintained in the regular course of business of Kemper National Services.
5. Defendant's Exhibit G-3 is admitted into evidence as a document filed by defendant with the Industrial Commission on or about April 14, 2000, to further supplement its March 22, 2000, Form 24 Application and is also admitted into evidence as a record maintained in the regular course of business of Kemper National Services.
6. Defendant's Exhibit G-4 is admitted into evidence as a document filed by defendant with the Industrial Commission on or about May 3, 2000, in further support of its March 22, 2000, Form 24 Application and is also admitted into evidence as a record maintained in the regular course of business of Kemper National Services.
7. Plaintiff's Exhibit G-1 is admitted into evidence as a document filed by plaintiff with the Industrial Commission on or about March 27, 2000, in response to defendant's Form 24 Application.
8. Plaintiff's Exhibit G-2 is admitted into evidence as a document filed by plaintiff's attorney with the Industrial Commission on or about April 24, 2000 to supplement plaintiff's response to the March 22, 2000 Form 24 Application.
9. Plaintiff's Exhibit G-3 is admitted into evidence as a document filed by plaintiff's attorney with the Industrial Commission in further response to defendant's March 22, 2000, Form 24 Application. *Page 4 
10. Stipulated Exhibit G-2 is admitted into evidence as the Administrative Decision and Order filed May 11, 2000, by Special Deputy Commissioner James C. Gillen regarding defendant's March 22, 2000, Form 24 Application.
11. Defendant's Exhibit G-5, Industrial Commission Form 33, is admitted into evidence as the request for hearing filed by defendant with the Industrial Commission on or about May 17, 2000, following receipt of the Decision and Order of Special Deputy Commissioner Gillen.
12. Defendant's Exhibit G-6, Industrial Commission Form 25N, is admitted into evidence as a document filed by defendant with the Industrial Commission transferring vocational rehabilitation services from Mr. Russell to Ms. DeBaer.
13. Defendant's Exhibit G-7 is admitted into evidence as the Form 24 Application filed by defendant with the Industrial Commission on January 3, 2001. Pages 2 through 13 of Defendant's Exhibit G-7 are also admitted into evidence as records maintained in the regular course of business of America Works, Inc.
14. Plaintiff's Exhibit G-4 is admitted into evidence as the document filed by plaintiff with the Industrial Commission in response to defendant's January 3, 2001, Form 24 Application.
15. Plaintiff's Exhibit G-5 is admitted into evidence as a document filed by plaintiff's attorney with the Industrial Commission on or about February 26, 2001, to supplement plaintiff's Form 24 objection to the January 3, 2001, Form 24. Pages 8 through 34 of Plaintiff's Exhibit G-5 are also admitted into evidence as records maintained in the regular course of business of the preparer of the record identified therein. *Page 5 
16. Stipulated Exhibit G-3 is admitted into evidence as the Administrative Order filed by former Special Deputy Commissioner Gina E. Cammarano on March 13, 2001.
17. Defendant's Exhibit G-8, Industrial Commission Form 33, is admitted into evidence as the request for hearing filed by defendant with the Industrial Commission on or about March 21, 2001, as an appeal from the Administrative Order of former Special Deputy Commissioner Cammarano.
18. The following records are admitted into evidence as records maintained in the regular course of activity of the physician or institution identified:
DEFENDANT'S EXHIBIT NO. RECORD
 G-9 Vocational Rehabilitation Service Plan (one page)
 G-10 Kemper National Services (51 pages)
 G-11 Hand Rehabilitation Specialists (9 pages)
 G-16 Joseph Guarino, M.D. (4 pages)
 G-17 Xaje Hasanaj, M.D. (4 pages)
PLAINTIFF'S EXHIBIT NO. RECORD
 G-6 J. Wayne Keeling, M.D. (26 pages)
 G-8 Julia Brannon, Ph.D. (4 pages)
 G-9 Daniel Bradford, M.D. (4 pages)

19. Plaintiff's Exhibit G-7, containing 19 pages, is admitted into evidence as letters written by plaintiff's counsel and mailed to the addressees on or about the date of each respective letter.
20. Defendant's Exhibit G-12 is admitted into evidence as the current r É sum É of R.A. Russell, Jr.
21. Defendant's Exhibit G-13 is admitted into evidence as the current r É sum É of Linda DeBaer. *Page 6 
22. Defendant's Exhibit G-14 is admitted into evidence as the Industrial Commission Form 25N filed by defendant with the Industrial Commission on or about June 28, 2001, transferring vocational rehabilitation services to John McGregor.
23. Defendant's Exhibit G-15 is admitted into evidence as records maintained in the regular course of business of John P. McGregor Vocational Rehabilitation Services. Defendant's Exhibit G-18 is admitted into evidence as the current C.V. of Mr. McGregor.
24. The parties reserve the right to offer testimony by deposition from J. Wayne Keeling, M.D., Donna Jones, Brian K. Preston, M.S., Robert Ballantyne, Ed. D., R.A. Russell, Jr., Linda DeBaer, William T. McClure, M.S., Joseph Guarino, M.D., Xaje Hasanaj, M.D., Julia Brannon, Ph.D., Daniel Bradford, M.d. and Michele Brown.
25. The issues for decision by the Commission include whether plaintiff reasonably complied with vocational rehabilitation services provided by defendant through Mr. Russell, Ms. DeBaer and Mr. McGregor and, if not, whether defendant is entitled to suspend plaintiff's temporary total disability compensation for this reason.
26. Defendant contends that there is an additional issue of whether plaintiff is capable of obtaining and retaining suitable employment. Plaintiff contends that the additional issue is whether plaintiff is entitled to continued payment of compensation for total disability.
27. Following the filing of the Full Commission March 8, 2007 Opinion and Award, the depositions of Dr. Jack Spector, Dr. George Edwards, Dr. Wayne Keeling, and Dr. Julia Brannon, were taken and are admitted into evidence.
 *********** *Page 7 
Based upon the stipulations of the parties, including stipulated documents, and the competent, credible evidence adduced at the hearing, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff was 47-years-old at the time of the hearing before the deputy commissioner. She was previously employed with defendant-employer and with Fieldcrest Cannon, Inc., the former owner of the plant, since approximately 1973, first as a twister tender until 1994 and thereafter as an automatic setting machine operator or auto set operator.
2. Plaintiff contracted a compensable occupational disease, bilateral carpal tunnel syndrome, as a result of performing job duties with defendant, first as a twister tender and thereafter as an automatic setting machine operator or auto set operator.
3. On November 18, 1998, this case was heard before former Deputy Commissioner Amy L. Pfeiffer in Wentworth on the issue of whether plaintiff was entitled to any additional indemnity compensation since October 23, 1996. In her decision filed August 20, 1999, Deputy Commissioner Pfeiffer concluded that plaintiff was entitled to disability benefits, but also concluded that she was capable of returning to work within the restrictions imposed by her treating physician, ordered defendant to provide plaintiff assistance in locating employment, and ordered plaintiff to cooperate with the vocational services provided by defendant.
4. On September 17, 1999, defendant notified the Industrial Commission that Richie A. Russell, Jr. had been assigned as plaintiff's rehabilitation professional. After Mr. Russell began providing vocational assistance to plaintiff, she participated in a work hardening program and, by the end of the program, exhibited a significant increase in bilateral grip strength. On November 15, 1999, Dr. Wayne Keeling of Rockingham Orthopaedic Associates determined that *Page 8 
plaintiff could return to full time light duty work with restrictions. Job search activities were resumed.
5. From November 1999 to March 2000, Mr. Russell engaged in job placement assistance activities with plaintiff. During a prior job placement evaluation plaintiff had indicated a desire to work with the public. Mr. Russell assisted plaintiff in locating jobs that included sales representative, convenience store cashier, night auditor/desk clerk, and staffing positions. Plaintiff engaged in a pattern of conduct during this period of time designed to sabotage job placement activities, including indicating a required wage higher than being offered, showing potential employers a copy of doctor's work restrictions instead of asking about job duties, failing to indicate available times for work on job applications, refusing to go in person to fill out job applications, and telling potential employers she had been out of work for three years and was "totally disabled." Additionally, plaintiff refused an employment offer when made, indicating a desire for a position not available. Plaintiff also would not return calls from
potential employers, was difficult for Mr. Russell to contact, and would frequently return calls to his office after business hours.
6. On March 22, 2000, defendant filed a Form 24 Application to Terminate or Suspend Payment of Compensation Pursuant to N.C. Gen. Stat. § 97-18.1 for plaintiff's failure to cooperate fully and in good faith with vocational rehabilitation services as she had been ordered to do in the Opinion and Award of Deputy Commission Pfeiffer filed August 20, 1999.
7. On April 24, 2000, plaintiff's counsel filed a Supplement to Form 24 Objection and Motion to Change Rehabilitation Professional pursuant to Rule X of the Commission's Rules for Utilization of Rehabilitation Professionals. The basis for this change was cited as misdirected efforts by defendant's rehabilitation professional in job placement activities *Page 9 
contributing to deterioration in the relationship between the rehabilitation professional and plaintiff.
8. On May 11, 2000, Special Deputy Commissioner James Gillen filed an Administrative Decision and Order in which he determined that the issues raised by defendant's March 22, 2000, Form 24 could not be determined in an administrative setting and referred the case to the dockets department for a full evidentiary hearing.
9. Defendant then voluntarily filed a Form 25N re-assigning plaintiff's case from Mr. Russell to vocational professional Linda DeBaer of America Works, Inc.
10. Thereafter, Ms. DeBaer assisted plaintiff with vocational and job placement activities. Plaintiff's self-reported primary vocational goal was to obtain a position as a teacher's aide. Plaintiff was thus enrolled in a teacher's aide training program at Rockingham Opportunities. During this time Dr. Keeling, plaintiff's treating physician, increased the number of hours plaintiff could work as an aide to full time. Plaintiff refused to do so, however, on the
basis that she had originally been programmed for part-time work only.
11. On November 28, 2000, Ms. DeBaer met with personnel from the local Head Start Program and Rockingham Opportunities to discuss volunteer, training and future employment possibilities for plaintiff, in order to place plaintiff as a volunteer teacher's aide at Head Start for additional training. Ms. DeBaer advised plaintiff that the Head Start program often hires from its volunteer pool. Plaintiff arrived late for the meeting and was present only for the last ten minutes of the session. Plaintiff was advised at this meeting that she would have to obtain a TB shot to start the position with Head Start.
12. On December 4, 2000, plaintiff still had not obtained a TB shot, claiming the shot cost too much and stating that she had been told by her attorney that she did not have to *Page 10 
participate at Head Start because it was a volunteer situation.
13. On December 5, 2000, Ms. DeBaer reported that during all follow-up contacts with plaintiff, she continued to state that her attorney had told her she did not have to go along with this rehab plan. Plaintiff also continued to refuse to obtain a TB shot. Ms. DeBaer reported further that plaintiff had advised the Head Start teacher that she would volunteer for one hour only. On Tuesday, December 5, 2000, plaintiff arrived at the center at 8:30 a.m. and left promptly at 9:30 a.m. Plaintiff informed the center that she did not know when she would be able to volunteer again.
14. As a result of plaintiff's lack of enthusiasm and motivation, planned credentialing programs to certify plaintiff to work as a day care provider were discontinued. Ms. DeBaer reported that the actions of plaintiff had sabotaged placement efforts and that there was not another suitable program in Rockingham County in which to place plaintiff.
15. On December 21, 2000, Ms. DeBaer reported that plaintiff had continued to "drop in" unannounced at the Head Start Day Care Program, where she would stay for approximately one-half hour to one hour. Plaintiff would merely observe, then leave. On December 19, 2000, plaintiff informed Head Start personnel that she would no longer be volunteering, based upon a conversation she had with her attorney.
16. On December 21, 2000, Ms. DeBaer assessed that any efforts to place plaintiff with the Head Start program had been negatively impacted due to her desire to follow her own process rather than the agreed-upon process. As of that date, plaintiff's program plan was discontinued.
17. On January 3, 2001, defendant filed a second Form 24 Application to Terminate or Suspend Payment of Compensation Pursuant to N.C. Gen. Stat. § 97-18.1 for plaintiff's failure *Page 11 
to cooperate fully and in good faith with vocational rehabilitation services as she had been ordered to do.
18. In a decision filed March 13, 2001, former Special Deputy Commissioner Gina Cammarano denied defendant's Form 24 Application.
19. Defendant appealed, filing a Form 33 Request for Hearing. Such hearing was scheduled on June 15, 2001, in Wentworth, North Carolina, before former Deputy Commissioner Garner who, after discussion with the parties and their attorneys, postponed the hearing. Deputy Commissioner Garner recommended another vocational specialist to work with plaintiff and, in open court, reiterated to plaintiff she was required to cooperate with such specialist to help find her a job.
20. A Form 25N was thereafter filed assigning John McGregor as plaintiff's rehabilitation professional. Mr. McGregor was recommended by plaintiff's counsel.
21. Upon request of defendant through counsel, this case was rescheduled for hearing on December 3, 2002, at which time Mr. McGregor testified that he conducted an initial interview of plaintiff on July 31, 2001. He stated that he reviewed the prior activities in plaintiff's case and plaintiff stated during the interview that she was very interested in becoming a teacher's assistant. Mr. McGregor testified that he tried to convince plaintiff to pursue some other vocation, but she insisted that she would be good at the job.
22. Mr. McGregor testified further that he completed a job search assessment and determined that a position was available with Head Start in Rockingham County. However, the position required a high school diploma with some college-level coursework in early childhood development or a related field and some experience in teaching pre-school children. Mr. McGregor thus recommended that plaintiff begin taking remediation courses to improve her *Page 12 
reading and math skills and then start the Early Childhood Credentials Program classes I and II at the local community college. Mr. McGregor determined that plaintiff could receive the required experience through continued volunteer work with Head Start and recommended that she begin a regular schedule of volunteering at Head Start, with specific hours and assigned responsibilities. Mr. McGregor prepared an Individual Written Rehabilitation Plan that included a Primary Vocational Goal for the Injured Worker, Services Required to Achieve Goal, Responsibilities of the Injured Worker, and Responsibilities of the Rehabilitation Counselor. This plan was communicated to plaintiff and she indicated that she understood it.
23. Defendant approved Mr. McGregor's recommendation for enrolling plaintiff in remedial coursework at the local community college in conjunction with volunteer job training at Head Start. Remediation classes were scheduled beginning September 4, 2001.
24. Mr. McGregor testified that plaintiff complied with all instructions to take remediation classes and, also as instructed, began taking Early Childhood Credentialing classes in January of 2002. Additionally, Mr. McGregor testified that he met with plaintiff's doctor, Dr. Keeling, who approved all duties of a teacher's aide with the exceptions of cutting with scissors, making bulletin boards, and wiping tables. Dr. Keeling recommended physical therapy to address those limitations. Defendant provided plaintiff with a three-week industrial physical therapy program, at the completion of which Dr. Keeling approved her return to work in the position of teacher's aide with no restrictions as to any duties.
25. Plaintiff resumed volunteer work at Head Start on January 25, 2002, attending an educational staffing meeting. She then was in the classroom with Head Start teacher Rhoda Proffitt on January 31, 2002, and February 1, 2002, for three and a half hours each day. However, following a meeting with Head Start personnel, Mr. McGregor reported that the *Page 13 
volunteer arrangement was not working out as plaintiff had claimed that she was unable to use a spray bottle to apply disinfectant to tables, push a small supply cart, wash dishes, remove plastic trays from tables after meals, empty trash cans, and was unable to understand and follow simple directions for an art project to be completed with four children. Mr. McGregor further testified that plaintiff was reportedly more time-consuming to supervise than the children, had a flat affect and did not interact positively with the children. The Head Start teacher to whom plaintiff was assigned was unwilling to work with her in the future.
26. Based on the results of the industrial physical therapy program and the other competent, credible evidence of record including Dr. Keeling's approval for plaintiff to work as a teacher's aide, the Full Commission finds that plaintiff was physically capable of performing all the requirements of the volunteer position at Head Start.
27. Plaintiff completed her credentialing courses by mid May 2002, earning a "C" in the first and a "B" in the second. However, plaintiff initially turned down opportunities offered by Ms. Watt-Wilkerson, the instructor in the credentialing courses, to volunteer with a child development center at Reidsville High School operated by Ms. Watt-Wilkerson. Mr. McGregor testified that these volunteer positions often lead to paid positions. Additionally, Mr. McGregor testified that plaintiff discovered that there was a Parent Resource Center at the Eden mall that provides a lending library of games, books, and other instructional materials for parents to use with their children. This library is staffed by one part-time coordinator and volunteers. Plaintiff advised Mr. McGregor that she would prefer to volunteer at this location, despite being told that this was not a position with prospects for paid employment, would not provide her with useful experience, and was not the type of job for which she had been taking classes and training. Plaintiff continued to state that she was not interested in volunteering at the location that might *Page 14 
lead to a paid job and told Mr. McGregor she would let him know about the Eden mall position.
28. On April 24, 2002, Mr. McGregor convinced plaintiff to begin volunteering at the Reidsville High School child development center. A schedule was set up with plaintiff volunteering from 11 a.m. to 3 p.m. Monday through Friday, and plaintiff began volunteering on May 7, 2002. She worked at the center for 12 days. Throughout this time, she reported that she was unable to perform the tasks she was assigned to perform because they allegedly caused her severe pain. Plaintiff, however, reported that she did not have trouble with playground duties and reading to children, which were tasks that she had complained had been a problem at Head Start. Based upon plaintiff's performance, she did not receive a reference for employment. As a result of plaintiff's lack of cooperation in doing the required work in that child care setting, volunteer training was terminated on May 22, 2002.
29. Mr. McGregor reported that on October 1, 2002, he was provided with copies of medical evaluations used by plaintiff in her successful effort to qualify for Social Security disability, reports that had not been previously made available to him, defendant's attorney, or plaintiff's workers' compensation attorney. Plaintiff did not inform Mr. McGregor that she was applying for Social Security Disability when he began working with her or when he scheduled training classes for her, despite meeting with plaintiff two days after her evaluation by one of the Social Security evaluators, Dr. Bradford. The evaluations include plaintiff's self-report of "hearing voices." Given these evaluations, Mr. McGregor testified that he felt plaintiff would need a psychological evaluation before any further job placement efforts for placing her in a setting involving children should be undertaken.
30. Mr. McGregor testified that, in his opinion, plaintiff had no desire to return to work and that job placement efforts had failed as a result of her lack of motivation. He stated *Page 15 
that when he assumed services for plaintiff's case he had felt that, with his help and with reeducation, plaintiff could be placed in a job that was within her restrictions. However, despite satisfactory progress in the educational setting, when it came time to get a job, plaintiff was not willing to follow through.
31. Plaintiff testified that she had spoken with someone in the school system in Rockingham County prior to starting the education program outlined by Mr. McGregor and had been told she would not be hired by the school system as a teacher or teacher's aide. Plaintiff did not inform Mr. McGregor of this alleged conversation. Plaintiff also claims that Mr. Russell, Ms. DeBaer and Mr. McGregor are not being honest in their reports regarding her failure to cooperate with vocational rehabilitation services.
32. As of August 1, 2007, Dr. Keeling opined that he does not believe plaintiff is capable of gainful employment due to her hand pain. However, Dr. Keeling also noted that there has been no change in plaintiff's condition since November 1999 and believed plaintiff was physically capable of performing the duties of a teacher's assistant. Rather, Dr. Keeling's opinion that plaintiff is not capable of employment is based solely on plaintiff's subjective complaints of pain and her statements that she is unable to perform work.
33. Plaintiff was examined by Dr. George Edwards on March 6, 2008. Plaintiff's physical examination was normal, with full motion of the wrists and normal strength in the thenar muscles of the thumb. Dr. Edwards found no atrophy in plaintiff's wrists and he could not localize any specific abnormalities to plaintiff's carpal tunnel or median nerves. Dr. Edwards opined that he did not believe plaintiff had carpel tunnel syndrome and saw no basis for assigning any specific work restrictions.
34. Dr. Julia Brannon, a licensed clinical psychologist, first examined plaintiff on *Page 16 
August 29, 2000 for a comprehensive clinical evaluation pursuant to plaintiff's application for Social Security Disability. Dr. Brannon conducted an intelligence test and a comprehensive achievement test. The results showed plaintiff functioning at an extremely low range of aptitude with a 6th grade level for reading and math and a 3rd grade level of writing skills.
35. Dr. Brannon re-examined plaintiff on June 13, 2007. While Dr. Brannon opined that plaintiff's intellectual limitation would negatively impact any vocational rehabilitation attempts because of plaintiff's difficulty comprehending complex verbal instructions and short-term memory, she believed plaintiff would be capable of learning a job through repetition and be able to perform adequately as she did in her past employment with Mohawk Industries. Dr. Brannon observed that plaintiff may be limited in her ability to successfully work with children due to her non-physical limitations.
36. On February 15, 2008, plaintiff was examined by Dr. Jack Spector, a board-certified neuropsychologist. Dr. Spector determined plaintiff to have an I.Q. of 75, placing her in the borderline impaired ranged of intellectual ability. Dr. Spector opined that plaintiff has the ability to follow instructions and interact with peers so long as the instructions and interaction are at a level consistent with her borderline impaired intellectual abilities and she would be better suited for unskilled or semi-skilled occupations.
37. When asked whether plaintiff's past inconsistent behavior in the vocational rehabilitation process was due to a lack of understanding related to her limited intellectual abilities, Dr. Spector opined that it would depend upon the level at which the instruction to plaintiff was framed.
38. Dr. Spector and Dr. Brannon found evidence of somatization in plaintiff's complaints of pain, pointing out that plaintiff over-reported physical complaints. Both opined *Page 17 
that plaintiff relates any emotional or intellectual difficulties through complaints of physical pain. Somatization is fundamental to the psychological makeup of an individual and is part of their personality.
39. Plaintiff is physically capable of performing work within the restrictions assigned to her by Dr. Keeling in November 1999.
40. Further, plaintiff is physically and mentally capable of participating in vocational rehabilitation so long as it is tailored to her intellectual capabilities. Plaintiff has not shown that her failure to comply with past vocational rehabilitation was due to her limited intellectual capabilities. There is no evidence from the two psychologists who provided testimony in this matter that the actions plaintiff engaged in during her vocational rehabilitation were due to her limited intellectual capabilities.
41. Based on plaintiff's inconsistent behavior in the vocational rehabilitation process and her testimony which was credibly contradicted by the testimony of Mr. McGregor, the Full Commission rejects plaintiff's allegation that she has cooperated to the best of her ability with the vocational services provided by defendant. The overwhelming weight of the credible evidence establishes that plaintiff has not fully and in good faith complied with job placement efforts as she was ordered to do both by former Deputy Commissioner Pfeiffer and at the June 15, 2001 hearing before former Deputy Commissioner Garner.
 ***********
The foregoing Stipulations and Findings of Fact engender the following additional:
 CONCLUSIONS OF LAW
1. The preponderance of the competent and credible evidence establishes that plaintiff has engaged in a deliberate course of conduct to sabotage the job placement efforts *Page 18 
provided to her by her employer. Plaintiff has been provided three different vocational placement professionals to assist her in retraining and job placement, including one recommended by plaintiff's counsel. Defendant has met its obligations under the August 20, 1999 Opinion and Award of Deputy Commissioner Pfeiffer to provide plaintiff assistance in locating employment. N.C. Gen. Stat. § 97-25.
2. Plaintiff was provided several volunteer positions likely to lead to a paid job and, in each case, engaged in conduct that resulted in her not being offered a job. In each attempt at placement, plaintiff has clearly evidenced intent not to cooperate fully and in good faith, in violation of the Industrial Commission Order that she do so. N.C. Gen. Stat. § 97-25.
3. Plaintiff's violation of the Industrial Commission Order for her to cooperate with vocational rehabilitation services provided by defendant entitles defendant to suspend her weekly compensation payments. N.C. Gen. Stat. § 97-25.
4. Should plaintiff wish to resume vocational rehabilitation in an effort to find suitable employment and resume temporary total disability payments, defendants shall re-initiate vocational rehabilitation that shall be catered to plaintiff's limited intellectual abilities and shall reinstate temporary total disability benefits only after plaintiff has demonstrated a pattern compliance with defendants' reasonable vocational rehabilitation efforts. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the undersigned enters the following:
 AWARD *Page 19 
1. Defendant's Form 24 Application to Terminate or Suspend payment of Compensation Pursuant to N.C. Gen. Stat. § 97-18.1 is APPROVED, and defendant is permitted to suspend plaintiff's temporary total disability benefits effective January 17, 2003.
2. Each side shall pay its own costs.
This the 20th day of November 2008.
 S/___________________
 DIANNE C. SELLERS
 COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER *Page 1